UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | No. 05-cv-1018 |
| | ) | |
| v. | ) | |
| | ) | |
| PEKIN MEMORIAL HOSPITAL, | ) | |
| | ) | |
| Defendant. | ) | |

**O P I N I O N   A N D   O R D E R**

Before the Court is a Motion to Dismiss (Doc. 44) and accompanying Memorandum (Doc. 45), and a Motion to Reconsider (Doc. 49) and accompanying Memorandum (Doc. 50), both filed by Defendant. Plaintiff has also filed a Response (Doc. 47 & 51) to each Motion. For the following reasons, the Motion to Reconsider is DENIED and the Motion to Dismiss is GRANTED.

The relator, Deborah Landrith, filed this *qui tam* action pursuant to the federal False Claims Act ("FCA"). 31 U.S.C. §§ 3729 – 3733. Landrith was a billing coder specialist for Defendant from 1984 through 2002 and her responsibilities included Medicare billing for Defendant. According to Landrith's Complaint, Defendant intentionally miscoded certain procedures and committed other acts which defrauded the United State's Medicare program. Defendant previously filed a Motion to Dismiss which argued that Landrith had failed to describe the alleged fraud with the necessary specificity required by Federal Rule of Civil Procedure 9(b).

This Court held that Landrith's Complaint had described the fraud with the necessary level of specificity, but the Complaint failed to describe which individuals were involved with the fraud. Accordingly, the Court granted the Motion to Dismiss, but gave Landrith leave to amend her Complaint to include the names of individuals involved in the fraud and descriptions of their involvement.

Landrith has now filed a Second Amended Complaint and Defendant has filed a new Motion to Dismiss. In addition, after our Appellate Court issued a decision in <u>United States ex rel. Fowler v. Caremark RX, LLC</u>, 496 F.3d 730 (7th Cir. 2007), Defendant filed a Motion to Reconsider in which they argued that the Seventh Circuit has filled in gaps in the law which require this Court to reconsider its previous ruling that Landrith had described the fraud with the necessary level of specificity. These two Motions are currently pending before the Court.

## I.
## BACKGROUND

Landrith's Second Amended Complaint describes four specific areas where Defendant engaged in fraudulent activity in violation of the FCA. Count I states that Defendant falsely coded pre-operative testing as diagnostic testing. Specifically, Defendant would often code routine preoperative tests such as a complete blood count, a chemistry profile, prothrombin[1], urinalysis, electrocardiogram and chest radiographs as diagnostic tests. According to the Complaint, these tests were ordered to determine if the patient was a suitable

---

[1] A prothrombin test is a test which checks the process of coagulation of a patient's blood. Stedman's 27th ed. 2000 prothrombin.

2

surgical candidate and had no relation to a treatment or illness for the surgical candidate. (Doc. 41 at 4-6.) Despite the fact that the tests were only intended to determine if the patient was a suitable candidate for surgery, the tests were fraudulently billed as diagnostic tests so that they would be covered by Medicare.

Count II discusses prostate screening exams. Under the Medicare program, only certain prostate screening exams are covered by Medicare. For example, only one prostate specific antigen test per year is covered for patients with lower urinary tract signs or symptoms for men under 50 who show no change in their symptoms. However, certain tests are always covered, such as tests performed on a patient who has an enlarged prostate that is causing him transient or chronic incontinence. In this case, so that Defendant would be reimbursed for all prostate screening tests, even those that they were not entitled to payment, the bill coders were directed to fraudulently code all prostate tests as tests on an individual who had an enlarged prostate that was causing him transient or chronic incontinence.

Count III discusses mammograms. Certain mammograms are covered depending upon a patient's age, history and symptoms. 42 C.F.R. § 410.34. However, all tests are covered if they are performed on a patient who has a lump in her breast. According to the Complaint, bill coders were directed to fraudulently code all mammograms as if they had been performed on a patient with a lump or mass in the breast, so that the test would be covered by Medicare.

Finally, Count IV discusses fraudulent signatures. According to the Complaint, Defendant would submit claims to Medicare with signatures that were

3

forged and unauthorized.  Specifically, she observed Medicare claims that were filed with a signature stamp bearing her name that she had never processed.  In addition, she personally observed claims that bore the electronic signature of a billing specialist named Marsha Mettam.  This is significant because these claims were dated as late as six months after Mettam's death.  According to the Complaint, the government is entitled to a civil penalty for each of the fraudulently signed claims.

Finally, Counts V through IX restate the same facts but allege common law claims including unjust enrichment, payment by mistake of fact, and common law fraud.

## II.
## ANALYSIS

**A. Motion to Reconsider**

Before turning to the issues raised in Defendant's Motion to Reconsider, it is necessary to recap this Court's reasoning behind the previous ruling on Defendant's previous Motion to Dismiss.

Rule 9(b) provides a higher standard of pleading than the typical "notice" standard seen under Rule 8.  Under Rule 9(b), "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."  While states of mind may be pleaded generally, the "circumstances" must be pled in detail.  This does not mean that courts are looking for a novel, but simply the "first paragraph of any newspaper story."  DiLeo v. Ernst & Young, 901

F.2d 624, 627 (7th Cir. 1990).  Namely, the complaint must state "the who, what, when, where and how. . ." of the alleged fraudulent activity.  Id.

This Court noted in the previous Order that in practice certain situations may require a more relaxed standard.  Namely, several of sister district courts have allowed a more lenient standard when pleading fraudulent transactions that are complex or cover a long period of time.  See In re Eli Lilly & Co., Prozac Product Liability Litigation, 789 F.Supp. 1448, 1456 (S.D.Ind. 1992); Hurd v. Monsanto Co., 908 F.Supp. 604, 614 (S.D.Ind. 1995); Terrell v. Childers, 836 F.Supp. 468, 475 (N.D.Ill. 1993); P & P Marketing Inc. v. Ditton, 746 F.Supp. 1354, 1364 (N.D.Ill. 1990).  So, for instance, if Landrith had alleged that the fraud in this case occurred over a period of only a few weeks, then this Court would have required Landrith to name the individual patients who had had their tests miscoded and describe how each test was miscoded.  However, the fraud in this case occurred over approximately eighteen years.  As a result, this Court applied the more lenient standard adopted by our sister district courts.  Under this more lenient standard, this Court did not require Landrith to describe each incidence of fraud and did not require Landrith to name the individuals who had had their test miscoded.

It is worth noting, however, that neither side presented any appellate authority which supports or rejects a more relaxed standard for a fraud that has occurred over an extended period of time.[2]  In particular, neither side presented any

---

[2] Landrith's counsel takes issue with this Court's conclusion that he failed to present any appellate authority on point and argues that such authority was provided in his previous Response.  (Doc. 28.)  In this Court's previous Order, we

5

Seventh Circuit authority which affirmed or rejected a more relaxed standard under such circumstances. Nevertheless, based upon the guidance provided by our sister district courts, this Court believed a more lenient standard was appropriate. Defendant has now submitted a Motion to Reconsider and argues that based upon new law laid down in Caremark, 496 F.3d 730, the Seventh Circuit has now made clear that district courts are not to apply this more lenient standard.

A court may allow a motion to reconsider when there has been a change of controlling law. Bank of Waunakee v. Rochester Cheese Sales, Inc., 906 F.2d 1185, 1191 (7th Cir. 1990). However, the Caremark decision does not present the controlling change described by Defendant.

In Caremark, the Seventh Circuit addressed a claim brought by two relators who were employed by Caremark at a drug processing facility. The relators alleged that Caremark committed several differed fraudulent schemes regarding the disbursement of prescription drugs for federal employees who received prescription

---

gave Landrith's counsel the benefit of the doubt and brushed over the fact that the appellate authority which he provided in his Response was grossly off point. Since he now takes issue with this Court's conclusion, we will flesh this issue out: The only appellate authority counsel presents in his brief when discussing this issue is United States ex rel. Thompson v. Columbia/HCA Healthcare Corp., 125 F.3d 899 (5th Cir. 1997). Counsel's reading of Thompson is entirely misplaced and the case does not support his argument. In Thompson, the Fifth Circuit addressed and dismissed a relator's claim under the FCA. The court never discussed the complexity of the claim or the length of time over which the fraud occurred. Ultimately, the court dismissed the relator's claim under the FCA because the relator's complaint failed to provide a factual basis for his belief that the defendant had submitted fraudulent claims. Nothing in Thompson would suggest a more relaxed standard for a fraud which has occurred over a lengthy period of time. Accordingly, this Court did not and does not consider Thompson relevant appellate authority that supports a more relaxed standard.

drugs under federal employee heath insurance plans. The decision delves into three of the alleged schemes[3] in which Caremark was accused of (1) failing to pay a credit to the government for returned prescription drugs; (2) changing prescriptions without a doctor's approval, and; (3) misrepresenting the savings obtained from changes in prescriptions.

In the first scheme, the relators alleged that a percentage of federal employees who received prescription drugs under their respective health plans returned the drugs unused to Caremark. As employees at a drug processing facility, the relators were aware that Caremark received the returns. However, they alleged that Caremark continued to bill the government for the cost of these medications or failed to provide a refund if the government had already paid for the prescriptions before they were returned. The relators presented individual prescriptions that were returned to Caremark and corresponding invoices in which Caremark continued to bill for the returned merchandise.

However, the Seventh Circuit dismissed the relator's claim regarding the first scheme for lack of specificity under Rule 9(b). In particular, our Appellate Court noted that the relator's had no knowledge of Caremark's financial department and no knowledge of how Caremark processed these returns. Based upon the complaint, the relators were only speculating that the government had been consciously defrauded because the relators had no knowledge of whether

---

[3] The decision does not discuss three additional alleged schemes because the relators failed to adequately brief the other alleged schemes on appeal. Caremark, 496 F.3d at 743.

7

Caremark's financial department was aware of the returned prescriptions. Or, it was entirely possible that Caremark processed a refund to the government for the returned prescriptions and the relators, as employees in the processing facility, had no personal knowledge if such refunds were ever provided.

In the second and third scheme, the relators argued that Caremark took advantage of a cost saving program. Under the program, Caremark could recommend a less expensive alternative prescription to a treating doctor and if the doctor took the suggestion, Caremark would receive a percentage of the savings for suggesting a cheaper prescription. The relators alleged that Caremark unilaterally changed the prescription instead of contacting the prescribing doctors and artificially inflated the savings for cheaper prescriptions. Based upon the relators' allegations, Caremark had submitted inaccurate claims to the government health plans for reimbursement for suggesting cheaper prescriptions. However, the relators had no evidentiary basis for alleging that Caremark, as a corporation, was actually aware of the inaccurate claims. As a result, our Appellate Court ultimately dismissed the claim related to these schemes as well because the relators did not provide any information that satisfied the knowledge requirement of the FCA.

Nothing in Caremark would suggest that our Appellate Court requires the same level of specificity for a simple, short lived fraud as is required for a complex scheme that has occurred over a lengthy period of time. In particular, the Court in Caremark never discussed the period of time over which the scheme occurred.

8

Furthermore, the fraud alleged at bar does not contain any of the gaps which existed in the allegations in Caremark.  Landrith has specifically alleged that Defendant was aware that they were committing fraudulent acts, and describes in the Complaint conversations which occurred between her and her supervisors in which she informed her supervisors that their billing practices were prohibited by Medicare.  Her supervisors allegedly responded and told her to continue the fraudulent billing practices.

This is not to say that the Complaint at bar fills in every detail of the alleged scheme.  Landrith has not detailed which patients had their tests miscoded and has not described which specific documents contained forged signatures.  Nevertheless, the alleged scheme in this case occurred over approximately eighteen years and presumably included hundreds, if not thousands, of patients and likely even more documents.  It would be impractical and unreasonable to expect Landrith to provide a complaint which included such a specific level of detail over such an extended period of time.

Furthermore, Landrith may not be able to recall every detail of the alleged eighteen year fraud and our Appellate Court has made clear that the requirements of Rule 9(b) are tempered somewhat where a plaintiff alleging fraud, prior to discovery, does not have access to all the facts necessary to provide details.  See Katz v. Household Int'l, Inc., 91 F.3d 1036, 1040 (7th Cir.1996).  Accordingly, this case may proceed to discovery.

9

**B. Motion to Dismiss**

Defendant has also filed a Motion to Dismiss in which Defendant asks this Court to Dismiss Landrith's common law claims. Defendant argues that Landrith, as a relator rather than a plaintiff, lacks standing to bring common law claims on behalf of the government.

Landrith concedes that the FCA does not give a relator standing to assert common law claims on behalf of the United States. United States ex rel. Rockefeller v. Westinghouse Electric Co., 274 F.Supp.2d 10, 14 (D. D.C. 2003); United States ex rel. Grant v. Rush-Persbyterian / St. Luke's Med. Center, No. 99 C 06313, 2001 WL 20807 (N.D. Ill. Jan. 16, 2001). However, Landrith argues that the government could reconsider intervening in this litigation at a later stage. If the government chose to intervene at a later stage, they could reinstate the common law claims. Accordingly, Landrith asks this Court to dismiss these claims *without prejudice*.

Indeed, the government can intervene in a *qui tam* action and bring a common law claim for unjust enrichment and payment by mistake. See, e.g., United States v. Tech Refrigeration, 143 F.Supp.2d 1006 (N.D. Ill. 2001). Accordingly, the Court will only dismiss the common law claims without prejudice.

However, it should be noted that this ruling does not give Landrith leave to conduct additional discovery into the common law claims. The government has declined to intervene at this time and the case must proceed on that assumption. Should the government choose to intervene at a later date and should additional

10

discovery be required for the common law claims to go forward, then the government will be responsible for conducting such additional discovery.

## CONCLUSION

IT IS THEREFORE ORDERED that Defendant's Motion to Reconsider is DENIED and Defendant's Motion to Dismiss is GRANTED.  Counts V through IX are dismissed without prejudice.  This matter is referred to the Magistrate Judge for pretrial proceedings.

ENTERED this  9th  day of July, 2008.

s/ Joe Billy McDade
Joe Billy McDade
United States District Judge
